Ford's Estate.

Argued April 23, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*John Hemphill,* of *Hemphill & Brewster,* with him *Henry Wharton, Jr., Robert H. Agnew* and *Wm. A.*

*Roseborough,* for appellant, Leighton M. Ford.—The will and codicil of 1924 were revoked on October 23, 1926, and October 26, 1927, by wills or other writings declaring a revocation as required by section 20 of the Wills Act of 1917: Stephenson's Est., 6 Pa. C. C. R. 628; Lawson v. Morrison, 2 Dall. 286; Flintham v. Bradford, 10 Pa. 82; Lutheran Congregation, 113 Pa. 32; Kerchener's Est., 41 Pa. Superior Ct. 112; Manning's Est., 46 Pa. Superior Ct. 607.

The express revocations contained in the two wills remain effective, regardless of the question of probate, because the statute does not limit revocation to wills alone but permits revocation by other writings as well.

The alleged duplicate original of the 1926 will, not being and never having been a will, is another writing declaring a revocation of the will and codicil of 1924.

The intention of the decedent was not to revive the earlier will but to die intestate: Flintham v. Bradford, 10 Pa. 82; Stephenson's Est., 6 Pa. C. C. R. 628; Lawson v. Morrison, 2 Dall. 286; Manning's Est., 46 Pa. Superior Ct. 607.

Where a former will is attempted to be set up from the cancelling of a later will, all facts evidencing the intention of the party therein shall be received in evidence.

*Frank B. Rhodes,* with him *Green & Quinn* and *Lutz, Ervin, Reeser & Fronefield,* for appellants, Media Title & Trust Company, and Thomas J. Williams, coexecutors.

*Henry S. Drinker, Jr.,* with him *Eric A. McCouch* and *H. Gordon McCouch,* for appellee.—The documents by which a testator may alter or revoke a prior will are specified as either "some other will or codicil in writing" or an "other writing declaring the same, executed and proved in the manner hereinbefore provided."

If the revoking document be a will, it can operate only as a will, being ambulatory until the death of the

testator. If, during the testator's lifetime, he destroys and hence revokes the revoking will, the latter becomes wholly ineffective for all purposes, and leaves the prior will as if the revoking will had never been executed.

The "other writing" permitted by the statute must, by its terms, be a writing *other.* than a will, and hence a revoking document designated by the testator as a will cannot operate as an "other writing."

The will of 1924 was not ipso facto annulled by the execution of the will of 1926 or of 1927.

The decisions in Pennsylvania expressly negative appellant's contention that the execution of a later will containing an express revocation clause ipso facto destroys the former will as a potential testamentary document: Flintham v. Bradford, 10 Pa. 82; Boudinot v. Bradford, 2 Dall. 266; Stephenson's Est., 6 Pa. C. C. R. 628; Carton's Est., 58 Pitts. L. J. 364; Heise v. Heise, 31 Pa. 246; Seiter's Est., 265 Pa. 202.

An instrument intended as a will cannot operate as an "other writing."

The executed carbon of the will of 1926 did not operate independently, as an "other writing."

The will of 1924 was not revoked by testator's supposed intention to die intestate, evidenced by declarations made in connection with the destruction of the later will of 1927: Jones's Est., 211 Pa. 364, 385.

It is entirely clear that the testator tore up the 1927 will in order to render it wholly ineffective in disposing of his estate. This, under the Pennsylvania decisions, is all that we are concerned with; what else, if anything, he had in mind no one can ever know: Evans's App., 58 Pa. 238; Emernecker's Est., 218 Pa. 369; Anderson's Est., 243 Pa. 34.

OPINION BY MR. JUSTICE SCHAFFER, September 29, 1930:

Did Albert E. Ford die intestate, in which event his estate passes under the intestate laws to his only son,

Leighton M. Ford, or did he leave the will whose probate was confirmed by the decree of the orphans' court, under which the son is disinherited? is the controversy we are called upon to decide on this appeal by the son.

Albert E. Ford was a man of large means. His estate, we are informed, aggregates between two and three million dollars. He was apparently an inflexible man of vigorous mentality, great determination and strong prejudices. He made many wills. Including the one admitted to probate dated February 15, 1924, with a codicil dated November 12, 1924, seven others were shown to have been executed by him, one in 1921, another in 1922, four in 1926 and one in 1927. Our concern will be with three of them which were produced, the one of February 15, 1924, another of October 23, 1926, and a third of October 26, 1927. All of these bore the admitted signature of the testator. The one carrying the latest date was revoked by the act of the testator in partly tearing it and directing that it should be further torn by another in his presence. The second one of the three was held by the court below to be invalid. It was prepared by his attorney in two copies, simultaneously made, an original and a carbon. After executing both, the testator retained the original and gave the carbon copy to the attorney with directions to keep it. The latter was produced by the attorney after the testator's death, duly proven and offered for probate. The original could not be found. Probate of the carbon copy was refused under the authority of Bates's Est., 286 Pa. 583, the legal presumption being that the testator had destroyed the original. The 1927 will was also proven and offered for probate, which was denied on the ground that the decedent had revoked it by destruction.

The 1924 will was not in the possession of the testator at the time of his death on March 22, 1928, and had not been since he signed the codicil to it on November 12, 1924. It was in the custody of the trust officer of a trust company which was named as executor, in a safe deposit

box in which other wills left with the trust company were kept,—not in the safe deposit box of the testator in that institution. The 1927 will the testator had kept with him in a small safe in his bedroom, from which it was taken by his direction five days before his death in order that he might revoke it. It remained in its torn condition, in a bureau drawer in his bedroom, from which it was produced after he died.

Both of these documents, that of 1926 and 1927, contained express clauses of revocation of prior wills. They opened with declarations to this effect. The will of 1926 thus: "I, Albert E. Ford,......do make, publish and declare this to be my last will and testament, and I hereby revoke and make void any will by me heretofore made"; that of 1927 in these words: "I, Albert E. Ford,...... do hereby make and declare this to be my last will and testament, hereby revoking and annulling all wills by me at any time heretofore made." Notwithstanding these clauses over the signature of the decedent, and other circumstances of moment to be hereafter referred to, the court below held, Judge STEARNE dissenting, that the effect of the tearing up of the 1927 will was to revive the one of 1924 and constitute it the last will of the testator.

The court below bases its conclusion on the provisions of the 20th section of the Wills Act of June 7, 1917, P. L. 403, 409, which reads: "Section 20(a) No will in writing, concerning any real estate, shall be repealed, nor shall any devise or directions therein be altered, otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the manner hereinbefore provided; or by burning, cancelling, obliterating, or destroying the same by the testator himself, or by someone in his presence and by his express direction. (b) No will in writing, concerning any personal estate, shall be repealed, nor shall any bequest or direction therein be altered, otherwise than

as hereinbefore provided in the case of real estate" (with an exception as to nuncupative wills).

We think the court too narrowly and literally viewed the language of the act and disregarded circumstances which should play a part in a just determination of what the legal situation was which was created by the testator's acts. At the very outset of reasoning about the matter let it be observed that we are not dealing, as the court below seems to have concluded, with an attempt to set up an oral revocation of the will of 1924. It was revoked by writings admittedly signed by the testator, which writings so signed are produced. The court below says they are to be disregarded as writings to revoke the earlier will because as wills they could not be effective until he died, and neither for legal reasons was so effective. Dispositively this is so, but as "other writings" which could be and were proved in the manner wills are, they were facts, which established that by solemn written declaration the decedent had wiped out the will of 1924. As against this we are asked to presume that when he tore and directed the further tearing of the pages of the 1927 will and thus revoked it, he intended to revive the one of 1924 when every circumstance in the record indicates that he did not.

Illuminating upon what his intent and purpose were is the story of the relations between this man, who was past 80 when death came to him, and his only child, the appellant, and particularly what occurred when the father revoked the 1927 will. Father and son had been associated together in business until sometime in the year 1921. The father had conceived a violent dislike to the son's wife, so strong that he persuaded or coerced the son into leaving her for a time. The son, however, returned to her, with the result that all relations, business and personal, between the two men ceased. The son withdrew from the business and he and the father did not speak. This was substantially the situation when the 1924 will was executed. It did not mention the son

nor did the will of 1926. Thereafter, through the mediation of a friend, they became reconciled. During the last year of the father's life their relations were filial and paternal. In the will of 1927, an annuity of five thousand dollars per annum was given to the son.

Early in 1928 the decedent became seriously ill and was confined to his room in an apartment house in Philadelphia, during the month of March to his bed. About three o'clock in the morning of March 17th he awoke and began talking to his nurse about "will" and "Leighton," saying "Get will and Leighton." While she understood who was meant by the latter word, she did not comprehend the meaning of the former, thinking it signified a person. Because of her failure to understand his wishes, the sick man directed her to awaken his secretary who lived with him in the apartment and was sleeping in another room. When the secretary appeared at the bedside, he was directed by Mr. Ford to "get my will," which was kept in a small safe in the bedroom. The secretary procured the paper from the safe and was instructed to turn to the last page, which he did, and handed it to Mr. Ford, who crumpled it and tore the last page and then handed it back to the secretary, directing him to further tear it, saying "Tear it and tell Leighton he is all I've got." The secretary, as he was directed, tore the will in half, gathered up the pieces from the bed, put them in an envelope and placed it in the bureau drawer, from which the mutilated document was produced following the death of Mr. Ford, five days later. After the torn will was placed in the bureau drawer, the sick man asked for his son and the secretary told him that he had been sent for. The son, who lived in the country a number of miles away, was telephoned for, and when the secretary met him, he told him what the father had said in connection with tearing the will. The nurse who was just outside the bedroom door heard Mr. Ford say "Tear it" or "Tear it up" and "Leighton is all I have got." When she returned to the room, the sick man asked her

to waken him when Leighton came. In the light of these circumstances, our minds do not yield to the conclusion that the decedent intended to reinstate the 1924 will.

There was marked dissimilarity in the three documents. The will of 1924 contained specific bequests to a niece, to two charities, and to a servant, and devised the residue of the estate to found a school of pomology on a farm which decedent owned in Delaware County to be known as the Ford School of Pomology. He expressed a desire that the trustees of the University of Pennsylvania should undertake the conduct of such a school, but stipulated that should the university not assume its conduct, his trustee should offer the net income of the estate to Pennsylvania State College for that purpose. The trustee was directed to pay over the net income from his residuary estate to the trustees of the University of Pennsylvania and to turn over to them his farm or in the event of their nonacceptance of the gift to turn it over to Pennsylvania State College, and if neither of these institutions would accept the gift, the trustee was to found and endow with the net income the Ford School of Pomology. If it should happen that the entire net income was not required for the conduct of the school, it was provided that the balance might be used by the trustees of the University of Pennsylvania or by Pennsylvania State College for such other university requirements as should be deemed advisable. The Franklin Trust Company was named as executor and trustee. By a codicil, he devised his residence in Philadelphia to the niece. This property he sold before his death. By this codicil he also appointed W. Freeland Kendrick executor and trustee to act in conjunction with the Franklin Trust Company. It is apparent from a study of this document that the plan which he had in mind for the creation of the school of pomology had not been fully worked out by him.

By the 1926 will he gave substantially the same specific legacies. In this writing he set forth that it was

his expectation to enter into a contract with the Pennsylvania State College for the erection of a school of pomology and for the support thereof "as will be provided for in the said contract." In the event that he should enter into such a contract, he authorized his executors to set aside from his estate a sum sufficient to perpetually maintain the school and to endow it in accordance with the provisions of the contract, and if any sum should be left after providing for the endowment he gave it to the University of Pennsylvania and State College in equal shares. It will thus be seen that his main purpose was still somewhat tentative. By this will he appointed W. Freeland Kendrick and a business associate, Thomas J. Williams, executors and trustees.

Under the will of 1927, there was a complete change. He gave to the Media Title & Trust Company as trustee a sum sufficient to produce an annuity of $5,000 per year to be paid to his son for life. He bequeathed a like annuity to the niece, but revoked this bequest in a codicil. He created a trust of $2,000 for the care of cemetery lots and another of $10,000 for establishing a suitable memorial to his mother. He bequeathed to the servant the same amount that he had in the two other wills, but made none of the other bequests which he had provided in them. The testimony discloses that with others whom he had selected he had procured the incorporation of the Ford School of Pomology. He recites in the will that it was then being incorporated. He devised all his real and personal property situate in Delaware County to this school for the purpose of maintaining and operating a school or college for the dissemination of instruction in the planting, cultivating, storing and marketing of fruits. The residue of his estate he directed to be turned over to the Media Title & Trust Company in trust, the net income to be paid to the Ford School of Pomology when incorporated, for the purposes of carrying on the work of the school on the farm bequeathed to it, empowering the trustee to expend $300,000 out of the principal

of the residuary estate in the erection and furnishing of buildings therefor. Thomas J. Williams and the Media Title & Trust Company were appointed executors and trustees, with the provision that where he had so named it the Media Title & Trust Company should act as sole trustee. It will thus be seen that the main purpose to be effectuated under each of these wills was the founding of the Ford School of Pomology, but the method of establishing it and carrying it on in the last one was utterly different from that provided by the will of 1924. The specific legacies given in that will were not carried into the last one, the reason being, as the testimony apparently discloses, that he had made the charitable contributions provided for in the 1924 will in his lifetime. It is well-nigh inconceivable, considering the main purpose that the decedent had in mind, the founding of the school of pomology, which he had progressed with sufficiently far to have had incorporated, and the bequests to which were entirely different in the 1927 will from those in the 1924 testament, that he could have had in mind and intended, when he revoked the 1927 will, to revive the provisions of the one of 1924. The plan that he had worked out for the school differed radically from that which he had in mind when he affixed his signature to the earlier document. As to the charitable bequests, it was inoperative because they had been paid. Disregarding for the moment statutes and rules of law and considering the actual situation as it existed when the testator tore up the 1927 will, our minds are forced to the conclusion that when he did so, he had completely forgotten the 1924 will and could not have intended it to be operative, and that in rendering nugatory the 1927 one he intended to die intestate, and that his expression to his secretary: "Leighton is all I've got," meant that he was yielding to the call of affection for his only son and intended that he should receive the entire estate.

It is the contention of the appellee, the University of Pennsylvania, that under section 20 of the Wills Act,

the express revocation clauses in the wills of 1926 and 1927 did not operate immediately on their execution permanently to destroy the prior will of 1924 as a potential document, independent of the operation of the specific wills as wills, and further that the declarations and circumstances attending the destruction animo revocandi of the will of 1927 are not admissible to show revocation of the prior will of 1924. It thus epitomizes its position in the opening paragraph of its brief: "The University of Pennsylvania has always maintained and still maintains, that the only fact which the statute per-. mits the court to consider in deciding the present case is the fact that, at the testator's death, the will of February 15, 1924, with the codicil thereto, was the only existing and surviving document which answered the statutory requirements of the last will and testament of Albert E. Ford, having been duly executed and proved in the manner prescribed by the statute, and having never been revoked or altered by any of the specific and exclusive methods therein prescribed." We do not read the statute as gyving the court with such narrow and harsh bands. As its very able counsel who presented its contention at our bar nears the end of his printed argument, standing to his guns, he asserts: "If at the time the testator tore the 1927 will he had said 'I intend also to revoke the 1924 will now in the box at the Franklin Trust Company and all other wills and to die intestate,' this, under the. statute, could not have operated to revoke the 1924 will." If such were the undisputed fact and such had to be held the result, its injustice would be shocking. The answer is that we are not dealing with an oral revocation alone but with written revocations admittedly signed by the testator, which the appellee admits would be valid if the documents were probatable wills, but which its counsel argues are not efficacious because neither of them actually became the will of the decedent. It is contended that wills are ambulatory and amount to nothing until the testator dies. The statute,

however, does not limit revocation to "some other will" but opens the door to "other writing," and does not say this "other writing" may not be an ineffective will, so long as it appears, as it does here, that the testator signed it. We repeat, this is not the case which appellee argues would offend the law, revocation "by oral evidence of declarations and of equivocal circumstances." Alone the oral declarations would not suffice, but coupled with the two undisputed writings, they do. The statute does not say "by writing other than a will" but "other writing." Furthermore, the statute itself contemplates that declarations made by one in the act of revoking a will shall be received because where there is revocation by destruction, it can be accomplished by "someone in his presence *and by his express direction.*" What the statute intended to prevent is parol revocation: Seitler's Est., 265 Pa. 202.

Appellee argues in substance that the wills of 1926 and 1927, with the clauses of revocation in them, are not to be considered, that we must indulge in the hypothesis that the decedent meant the 1924 will to survive in the face of his positive declarations in writing that he did not, and in the face of testimony which clearly indicates to us that he had forgotten about the 1924 will or regarded it as invalid because in subsequent wills he had revoked it. When he came to make the 1927 will, decedent declared to Frank B. Rhodes, Esq., his attorney who wrote it, a highly reputable member of the bar, in answer to the latter's inquiry as to whether he had another will, that he had not. Considering the fact of the many wills which he had made, it is not surprising that he overlooked the existence of some of them. Undoubtedly he had forgotten the carbon duplicate of the 1926 will which was extant, signed by him. It is manifest to us that he regarded the 1927 document as his only one, keeping it at his bedside.

What the appellee is here contending for is the rule first laid down by Lord MANSFIELD in Goodright v.

Glazier, 4 Burrows 2512 (1770), that the cancellation of a subsequent will works a revival of a prior one then in existence,* and which was followed in Flintham v. Bradford, 10 Pa. 82. In neither of these cases were the facts as they are here, two subsequent wills produced executed by the decedent expressly revoking the earlier will.

In 1 Schouler on Wills, Executors and Administrators, (6th ed.), section 685, at page 785, it is said: "Even the common law courts have questioned the broadness of the rule as Lord MANSFIELD first laid it down; and, indeed, it is possible that the eminent judge has not been accurately reported; while Sir JOHN NICHOLL, on the other hand, though professing that the law was unsettled in his day, gave a cautious preference to presuming against the revival of the former will rather than in favor of it. There is a distinction well taken in such cases (which Lord MANSFIELD may, if misreported, have had in view, though he probably had it not), namely, as between a later cancelled will which was merely inconsistent with the former one, and one which contained a clause expressly revoking it. Where the one will was expressly revoked by the other, it seems fairly presumable that the immediate absolute and unequivocal revocation in writing remains unaffected by equivocal acts of parol touching the later instrument; or, in other words, that if the subsequent will expressly revoke the prior one, a simple cancellation of the latter cannot set up the former one again." Page on Wills, (2d ed.), section 447, at page 718, says: "The common law rule, logical as it is in its application, probably does violence to the actual intention of the greater number of testators, especially where the later will contains an express revocation clause. Most of the laity apparently believe that

---

* For an interesting discussion of the doctrine, see a paper written by Mr. Justice OWEN J. ROBERTS of the Supreme Court of the United States in the year 1900, when he was an instructor in the law school of the University of Pennsylvania: 48 American Law Register, page 505.

the express revocation clause revokes the first will at once; and the rule that the revocation of the second will automatically leaves the first will in effect, frequently results in giving effect to a testamentary disposition which testator had long since forgotten, and which, if he had remembered it, he would have thought had no legal effect. The courts which distinguish between the cases in which the later will has an express revocation clause, and those in which it is merely inconsistent with the prior will, probably come nearer to the intention of the greater number of testators." See also to the same effect 1 Powell on Devises, (3d ed.), 528; 1 Alexander on Wills, section 557, page 758; Gardner on Wills, (2d ed.), page 243. The earlier conclusion of our court in 1796, Boudinot v. Bradford, 2 Dallas 266, was that the revocation of a second will did not revive a former one. Chief Justice McKean said in delivering the opinion in that case: "Where a second will is made, containing an express clause of revocation, the preceding will, though not formally cancelled, is revoked." In other jurisdictions having a similar statute to ours, it has been held an express revocation clause in a subsequent will is an immediate and final revocation of an earlier one: In re Laege's Est., 180 Wis. 32, 192 N. W. 373; In re Noon, 115 Wis. 299, 91 N. W. 670; Cheever v. North, 106 Mich. 390, 64 N. W. 455; Scott v. Fink, 45 Mich. 241, 7 N. W. 799; Blackett v. Ziegler, 153 Iowa 344, 133 N. W. 901; Colvin v. Warford, 20 Md. 357; Harwell v. Lively, 30 Ga. 315; Bohanon v. Walcot, 1 How. (Miss.) 336; Dougherty v. Holscheider, 40 Tex. Civ. App. 31; Brackenridge v. Roberts, 114 Tex. 418, 267 S. W. 244; Osburn v. Rochester Trust & Safe Deposit Co., 209 N. Y. 54; Pickens v. Davis, 134 Mass. 252; Danley v. Jefferson, 150 Mich. 590, 114 N. W. 470; Hawes v. Nicholas, 72 Tex. 481, 10 S. W. 558; 28 A. L. R. 911 et seq.

A clause of revocation in a will is a useless thing unless it has the immediate effect intended. The later will, if inconsistent, will revoke the preceding one without

such a clause.  As was said by the Supreme Court of Massachusetts in Pickens v. Davis, supra, page 256: "The clause of revocation is not necessarily testamentary in its character.  It might as well be executed as a separate instrument.  The fact that it is inserted in a will does not necessarily show that the testator intended that it should be dependent on the continuance in force of all the other provisions by which his property is disposed of.  It is more reasonable and natural to assume that such revocatory clause shows emphatically and conclusively that he has abandoned his former intentions." In some of the jurisdictions where the contrary has been held, Illinois and Connecticut for instance (Whitehill v. Halbing, 98 Conn. 21;  Stetson v. Stetson, 200 Ill. 601) the statutes are not similar to ours in that they contain no provision for revocation by an "other writing."  Rudy v. Ulrich, 69 Pa. 177, carefully considered, is not at variance with anything herein laid down.  The point of that case was that the entire will, including the revocation clause, was a nullity because of fraud.

We are of opinion that what was said by the decedent when he annulled the 1927 will was admissible in evidence to show his intent in the act he was performing. It is not the tearing up of a will that works its revocation, it must be torn up animo revocandi by the testator or at his direction, and when inquiry is made to show the intent, it opens up all the circumstances of what occurred at that time, including as the most important of all what the maker of the will said in the act of revoking it.  That part of it which referred to his son was not to be excluded because it aided the conclusion, as we think it does, that by his act he did not intend to revive the 1924 will but to die intestate.  Without the existence of the 1926 and 1927 wills, his declaration would have amounted to nothing so far as the 1924 will is concerned, but with them in being, signed by the decedent, it manifested his desires so far as the son was concerned and showed that his intent could not have been to revive the

1924 will. When we consider that he had become reconciled with his son and in the 1927 will had provided an annuity for him, it is impossible to believe that in tearing up the 1927 will he intended to reinstate that of 1924 in which the son took nothing; particularly is this so in the light of what he said when he mutilated it. Said COULTER, J., in Flintham v. Bradford, 10 Pa. 82, 92: "I will admit that if it was clearly proved that the testator, at the time he cancelled the posterior will, intended to die intestate, but had not the prior will then in his possession or power, so as to annul or destroy it, that such intent, existing at the time of cancellation, and connected with it, might be given in evidence as part of the transaction or res gestæ."

We, therefore, conclude that the register of wills erred in admitting the 1924 will to probate as did the court below in approving his act. We are of opinion that the decedent died intestate and that his son Leighton M. Ford as his heir at law is entitled to the estate.

The decree of the court below and of the register are set aside in appeal No. 188, January Term, 1930; all costs to be paid out of the estate.

The following order is made in appeal No. 193, January Term, 1930:

For the reasons stated in the opinion filed in No. 188, January Term, 1930, the decree of the register of wills and of the orphans' court, refusing probate of the will dated October 26, 1927, are affirmed; all costs to be paid out of the estate.

DISSENTING OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, September 29, 1930:

In my view, this case turns on a cold question of law, as to the proper construction to be placed on the Wills Act of June 7, 1917, P. L. 403, 409-10, section 20 of which, quoted in the majority opinion, provides that "no will in writing, concerning any real estate, shall be repealed......otherwise than by some other will or codi-

cil in writing, or other writing declaring the [repeal], executed and proved in the manner hereinbefore provided." It seems clear to me that the expression "other writing" must be taken to mean a writing possessing the essential qualities of a testamentary document; such, for example, as a memorandum, or even a letter, containing words of revocation, but signed at the end in the manner required to entitle it to probate as a testamentary document, though not in the form of a will or codicil. To my mind, "proved," as above employed, means "probated" in the manner provided by the Wills Act; for wherever the word "proved" appears in the preceding sections of the Act of 1917, and in the Act of April 8, 1833, P. L. 249-51, from which section 20 of the present statute was taken, it plainly means proved for the purpose of probate. The leading law dictionaries show that "probate" and "prove" are synonymous terms in the law of wills: see the word "probate" in Bouvier's, Black's and Anderson's Law Dictionaries. When section 20 of the Act of 1917 is thus read, it becomes plain to me that, since the writing which appellants claim revoked the will of 1924 was itself so destroyed that it could not be probated in the manner required by law, there was present no provable revocation of that will, which situation is tantamount to no revocation at all; therefore I cannot concur in the majority order reversing the court below and setting aside the decree which admitted the will of 1924 to probate.

All judicial rules concerning wills are subject to legislative control, and of this there has never been any doubt in Pennsylvania. Our General Assembly having ordained what shall constitute a revocation of a will, and, incidentally, what shall not, it is my opinion that the courts must abide by the legislative stipulations in that regard, and it will not do to say, as the majority opinion does, that only the dispositive parts of the 1927 will were revoked when that instrument was destroyed by the present testator. The same section 20 of the Act of

1917, quoted in the majority opinion, states, after the provision noted above, that a will may be revoked by "burning, cancelling, obliterating or destroying the same"; which, in the absence of anything specially showing a restricted destruction, I can only take to mean, revoked in full, and not merely as to its dispositive parts. When, as here, there is what amounts to a physical destruction of a testamentary instrument containing the revocation of a former will, in my opinion, all parts of the destroyed document are gone. It may be added that, as I view this case, the actual intention of the testator is not involved; the controlling question is purely one of statutory construction or legislative intention, and in that regard I note my dissent from the majority view.